**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GULFPORT ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-35562 (DRJ) |
| Debtors. | ) | (Jointly Administered)<br>(Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

**Emergency relief has been requested. A hearing will be conducted on this matter on November 16, 2020 at 3:30 pm (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Avenue, Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance." Select the case name, complete the required fields and click "Submit" to complete your appearance.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Gulfport Energy Corporation (1290); Gator Marine, Inc. (1710); Gator Marine Ivanhoe, Inc. (4897); Grizzly Holdings, Inc. (9108); Gulfport Appalachia, LLC (N/A); Gulfport MidCon, LLC (N/A); Gulfport Midstream Holdings, LLC (N/A); Jaguar Resources LLC (N/A); Mule Sky LLC (6808); Puma Resources, Inc. (6507); and Westhawk Minerals LLC (N/A). The location of the Debtors' service address is: 3001 Quail Springs Parkway, Oklahoma City, Oklahoma 73134.

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**Relief is requested not later than November 16, 2020.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (the "Motion"):

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5. The Debtors are an independent returns-orientated, gas-weighted, exploration and development company and one of the largest producers of natural gas in the contiguous United

States. The Debtors hold significant acreage positions in the Utica Shale of Eastern Ohio and the SCOOP Woodford and SCOOP Springer plays in Oklahoma. Headquartered in Oklahoma City, Oklahoma, the Debtors have approximately 259 employees. The Debtors' operating revenue for the twelve-month period that ended September 30, 2020, was approximately $1.35 billion, and, as of the Petition Date, the Debtors have approximately $2.41 billion in total funded debt obligations.

6. On November 13, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Quentin R. Hicks, Chief Financial Officer and Executive Vice President of Gulfport Energy Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed contemporaneously with this Motion and incorporated by reference herein.

7. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 14, 2020, the Court entered an order [Docket No. 4] authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

8. The Debtors' employees and temporary staff perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many

[2] Capitalized terms used but not defined herein shall have the meaning given to them in the First Day Declaration.

instances, the Debtors' employees and temporary workers include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees and temporary staff the Debtors' reorganization efforts likely will be jeopardized.

9. The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. If the Debtors are not permitted to continue paying compensation and providing benefits, the Debtors' employees will be exposed to significant financial constraints. Consequently, the relief requested herein is necessary and appropriate.

10. As of the Petition Date, the Debtors employ 257 individuals on a full-time basis and two individuals on a part-time basis (collectively, the "Employees"). Approximately 81 Employees are paid on an hourly basis and approximately 178 Employees receive a salary. None of the Employees are represented by a union or collective bargaining unit. In addition to the Employees, the Debtors also retain, from time to time, temporary staff (the "Temporary Staff"). The Debtors currently retain one Temporary Staff member from AcctKnowledge, a staffing agency (the "Staffing Agency"), to fulfill certain accounting-related duties on a short-term basis, and the number of Temporary Staff fluctuates based on the Debtors' specific needs at any given time. The Temporary Staff are a critical supplement to the efforts of the Employees.

## Employee Compensation and Benefits

11. To minimize the personal hardship the Debtors' workforce would suffer if employee-related obligations are not paid when expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, health and welfare benefits, and certain supplemental benefits the Debtors have historically provided to the Employees and Temporary Staff in the ordinary course of business

(collectively, the "Employee Compensation and Benefits"). The Debtors also seek to pay all costs incidental to the Employee Compensation and Benefits.

12. During 2020, the Debtors instituted temporary agreed salary reductions through December 31, 2020. As part of these measures, the Debtors' management team, Directors (as defined herein), and certain other Employees agreed to take a temporary reduction in compensation through December 31, 2020 (the "Voluntary Temporary Salary Reduction Program"). On January 1, 2021, the Voluntary Temporary Salary Reduction Program will terminate in accordance with its terms and participants will revert to their pre-program compensation.

13. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

14. The Debtors estimate that they owe approximately the following prepetition amounts in Employee Compensation and Benefits:

| Relief Sought | Amount |
|---|---|
| **Compensation and Withholding Obligations** | |
| Unpaid Wages | $320,000 |
| Unpaid Staffing Obligations | $7,000 |
| Withholding Obligations | $200,000 |
| Expense Reimbursements | $40,000 |
| Non-Employee Director Compensation | N/A |
| Non-Insider Severance Program | $18,000 |
| Discretionary Bonus Program | $750,000 |
| **Employee Benefit Programs** | |
| Health Insurance Programs | $750,000 |
| Brokerage Fees | $30,000 |
| Life and AD&D Insurance | $20,000 |
| Disability Benefits | $10,000 |
| Workers' Compensation Program | N/A |
| 401(k) Plan Deductions | $180,000 |
| 401(k) Plan Contributions | $100,000 |
| COBRA Benefits Program | N/A |
| Paid Leave | $1,670,000 |
| **Supplemental Employee Benefits** | |
| Stock Incentive Program | N/A |
| Other Additional Benefits Programs | $10,000 |
| **Total** | **$4,105,000** |

15. The Debtors do not believe there are amounts owed to any Employee on account of the Employee Compensation and Benefits that exceed $13,650, which is the priority expense cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## I. Compensation and Withholding Obligations.

16. In the ordinary course of business, the Debtors incur certain compensation and withholding obligations, including Unpaid Wages, Unpaid Staffing Obligations, Withholding Obligations, Expense Reimbursements, Non-Employee Director Compensation, Deferred Compensation, and severance payments pursuant to the Non-Insider Severance Program (each as defined herein and, collectively, the "Compensation and Withholding Obligations"). The Debtors historically paid approximately $2,440,000 per month on account of the Compensation and Withholding Obligations. By this Motion, the Debtors seek authority to pay any accrued and

outstanding prepetition amounts due pursuant to the Compensation and Withholding Obligations and to continue to honor the Compensation and Withholding Obligations in the ordinary course of business on a postpetition basis.

**A. Unpaid Wages.**

17. Every two weeks, the Debtors pay Employees' wages, salaries, and other compensation that accrue on a bi-weekly basis (collectively, the "Employee Compensation"). The Debtors pay their Employees' wage and salary obligations (the "Wages") on either a salaried or hourly basis up to one week in arrears and pay approximately $1,130,000 in the aggregate each bi-weekly period. The Debtors internally process and administer their payroll and reimbursements through one payroll system. Each two-week pay period, the Debtors calculate the Employee Compensation for each Employee and typically transfer funds sufficient to satisfy such obligations from the Debtors' bank account one to two days in advance of each applicable pay period. Employee Compensation is then distributed to the Employees on behalf of the Debtors.

18. Because Employees are paid in arrears, Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid based on overtime calculations. Resolution of such potential discrepancies may reveal that additional amounts are owed to such Employees.

19. Historically, the Debtors paid approximately $1,510,000 per month on account of all accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time off, and amounts related to the 401(k) plan) earned before the Petition Date (collectively, the "Unpaid Wages"). As of the Petition Date, the Debtors estimate that they owe approximately $320,000 to Employees on account of all Unpaid Wages. The Debtors seek authority to pay their

Employees any Unpaid Wages consistent with past practice and to continue paying Wages to their Employees on a postpetition basis in the ordinary course of business.

**B. Temporary Staff Compensation.**

20. The Debtors rely on Temporary Staff in the ordinary course of their business and currently retain one Temporary Staff member to perform accounting-related services critical to the Debtors' operations. The Debtors rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are necessary to meet the Debtors' intermittent needs but are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Temporary Staff (indirectly through payments to the Staffing Agency) is critical to minimizing disruption of the Debtors' continued business operations.

21. Historically, the Debtors paid approximately $12,000 per month on account of their Temporary Staff (the "Unpaid Staffing Obligations"). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Unpaid Staffing Obligations is approximately $7,000. The Debtors seek authority to pay any prepetition Unpaid Staffing Obligations consistent with past practice and to continue paying Unpaid Staffing Obligations on a postpetition basis in the ordinary course of business.

**C. Withholding Obligations.**

22. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Certain of the Deductions are forwarded to various third-party recipients. The Debtors deduct approximately $2,000 in aggregate from Employees' paychecks on account of the Deductions on a bi-weekly basis.

23. The Debtors are also required by law to withhold from the Employees' compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority at approximately the same time Employees' payroll checks are disbursed. The Debtors remit approximately $500,000 in the aggregate on account of the Payroll Taxes on a semi-monthly basis.

24. Historically, the Debtors paid approximately $1,070,000 per month on account of the Deductions and Payroll Taxes (together, the "Withholding Obligations"). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Withholding Obligations is approximately $200,000. The Debtors seek authority to pay any unpaid Withholding Obligations consistent with past practice and to continue paying unpaid Withholding Obligations on a postpetition basis in the ordinary course of business.

**D. Reimbursable Expenses.**

25. In the ordinary course of business, the Debtors pay or reimburse Employees for certain reasonable and customary expenses that such Employees incur in the scope of their employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, professional society membership dues, and other business-related expenses related to the discharge of an Employee's duties. The majority of the Employees qualified to receive Expense Reimbursements

are salaried Employees; however, some hourly Employees may also receive Expense Reimbursements.

26. Historically, the Debtors paid approximately $90,000 per month on account of the Expense Reimbursements. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Expense Reimbursements is approximately $40,000. The Debtors seek authority to continue and pay amounts relating to Expense Reimbursements in the ordinary course of business and consistent with past practice and to continue paying Expense Reimbursements on a postpetition basis in the ordinary course of business, including unpaid amounts owed to Employees and Directors (as defined below) on account of Reimbursable Expenses incurred through their Personal Funds, the Corporate Credit Cards, the Business Vehicle Reimbursement Plan, and the Educational Reimbursements (each as defined below).

**1. Personal Funds.**

27. Certain Employees and Directors that have not been issued a Credit Card (as defined below) may elect to use their personal credit cards or cash (collectively, the "Personal Funds") and seek reimbursement from the Debtors for Expense Reimbursements. Because these expenses are incurred through the use of Personal Funds, the Employee or Director is personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose a hardship on such individuals where the obligations were incurred for the Debtors' benefit.

28. In the ordinary course of business, Employees submit their expenses within 60 days from the date of incurrence via the Debtors' online platform, Workday, Inc. The Debtors then process reimbursement requests and pay the Employee for the approved expense, typically within two weeks from the date an approved expense report is received by the Debtors.

29. Historically, the Debtors have paid approximately $4,000 per month on account of Personal Funds. Due to the timing of when Employees submit Expense Reimbursements, it is

difficult for the Debtors to precisely estimate the amount of prepetition Personal Funds outstanding as of the Petition Date. Based on historical practice, the Debtors estimate that as of the Petition Date, the Debtors have accrued approximately $10,000 on account of Personal Funds. The Debtors seek authority to pay Personal Funds consistent with past practice and to continue paying Personal Funds on a postpetition basis in the ordinary course of business.

**2. Corporate Credit Cards.**

30. The Debtors provide certain Employees with corporate credit cards used by Employees required to travel or work in the field to cover legitimate business travel expenses (collectively, the "Credit Cards").[3] Expenses incurred on the Credit Cards are billed directly to the Debtors and do not pass through the applicable Employee's personal financial accounts.

31. Historically, the Debtors paid approximately $90,000 per month on account of the Credit Cards. Due to the timing of when Employees submit Expense Reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Credit Card obligations outstanding as of the Petition Date. Based on historical practice, however, the Debtors estimate that as of the Petition Date, the Debtors have accrued approximately $40,000 on account of the Credit Card obligations. The Debtors seek authority to pay any unpaid Credit Card obligations consistent with past practice and to continue paying any unpaid Credit Card obligations on a postpetition basis in the ordinary course of business.

[3] For the avoidance of doubt, the Debtors are seeking authority to pay prepetition obligations on account of the Credit Cards and to continue providing the Credit Cards, and the intercompany transactions in connection therewith, on a postpetition basis pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Maintain Existing Business Forms and Books and Records, and (C) Continue to Perform Intercompany Transactions and (II) Granting Related Relief*, filed contemporaneously herewith.

**3. Mileage Reimbursement Plan.**

32. The Debtors maintain a business vehicle reimbursement plan pursuant to which Employees using personal vehicles for business purposes are reimbursed with a mileage allowance consistent with the rate per mile as published by the Internal Revenue Service, provided that such use is authorized by the Debtors' management team (the "Mileage Reimbursement Plan"). As of the Petition Date, approximately twenty Employees participate in the Business Vehicle Reimbursement Plan.

33. The Debtors do not believe they presently owe any prepetition amounts on account of the Mileage Reimbursement Plan. For the avoidance of doubt, the Debtors seek authority to pay any amounts on account of the Mileage Reimbursement Plan due and outstanding as of the Petition Date and to continue paying amounts on account of the Mileage Reimbursement Plan in the ordinary course of business and consistent with past practice on a postpetition basis.

**4. Educational Reimbursements.**

34. The Debtors provide educational assistance payments to certain Employees (the "Educational Reimbursements"). To be eligible, the Employee must pursue education related to the Employee's job or career path and meet certain other criteria, such as receiving a proof of grade of an A, B, or a "pass." Educational Reimbursements are limited to $5,250 annually each year after one year of continuous service and the lifetime maximum for Educational Reimbursements is $42,000.

35. Historically, the Debtors paid approximately $6,000 per month on account of the Educational Reimbursements. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Educational Reimbursements is approximately $9,000. The Debtors seek authority to pay any unpaid Educational Reimbursements consistent with past

practice and to continue paying unpaid Educational Reimbursements on a postpetition basis in the ordinary course of business.

**E. Non-Employee Director Compensation.**

36. The Debtors' board of directors consists of eight non-Employee directors (each, a "Director"). Directors receive annual cash compensation for their services paid quarterly in advance as follows: (a) $85,000 as and for the annual cash retainer component of such compensation; and (b) $175,000 as and for the annual equity component of such compensation. In early 2020, the annual equity component of such compensation was converted to cash. Directors also receive additional compensation for his or her service on any committees typically ranging from $10,000 to $25,000 per month (the "Board Director Compensation").

37. The governing bodies of the Debtors other than Gulfport Energy Corporation include two non-Employee directors (the "Independent Directors"). The Independent Directors receive annual cash compensation of $250,000 for their services as an Independent Director. The Independent Directors are generally prepaid quarterly and are also entitled to expense reimbursement for reasonable out-of-pocket expenses in connection with their duties, as well as $5,000 per day for days on which the Independent Director spends more than four hours on activities related to their duties as Independent Directors (together with the Board Director Compensation, the "Non-Employee Director Compensation").

38. The Debtors do not believe they presently owe any prepetition amounts on account of the Non-Employee Director Compensation. For the avoidance of doubt, the Debtors seek authority to pay any Non-Employee Director Compensation due and outstanding as of the Petition Date and to continue paying Non-Employee Director Compensation to their Directors in the ordinary course of business and consistent with historical practice on a postpetition basis, including Board Director Compensation in full following the expiration of the Voluntary Temporary Salary

Reduction Program.

**F. Non-Insider Severance Program.**

39. The Debtors provide severance benefits to non-insider full-time Employees[4] in the event of a termination by the Debtors that is not for "cause," by reason of death or disability or if the Employee voluntarily resigns (the "Non-Insider Severance Program"). Historically, under the Non-Insider Severance Program, Employees receive a lump-sum payment pursuant to one of the standards below in addition to health insurance premium reimbursement based on years of service:

| Year(s) of Completed Service | Months of Separation Pay (Based on Year(s)) | Months of Employer Reimbursed Cobra Benefits |
|---|---|---|
| Less than 1 year | 3 months | 3 months |
| 1-2 years | 3.5 months | 3 months |
| 2-3 years | 4 months | 4 months |
| 3-4 years | 4.5 months | 5 months |
| 4-5 years | 5 months | 6 months |
| 5-6 years | 5.5 months | 7 months |
| 6-7 years | 6 months | 8 months |
| 7-8 years | 6.5 months | 9 months |
| 8-9 years | 7 months | 10 months |
| 9-10 years | 8 months | 11 months |
| 10+ years | 9 months | 12 months |

40. The Debtors believe that the Non-Insider Severance Program is critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success.

41. As a condition to receiving benefits under the Non-Insider Severance Program, the Debtors typically require that the participating Employee execute a release agreement, whereby

[4] For the avoidance of doubt, the Debtors do not request authorization to continue the Non-Insider Severance Program with regard to any "insider" as the term is defined in section 101(31) of the Bankruptcy Code (each, an "Insider"). Consequently, the Debtors submit that section 503(c) of the Bankruptcy Code with respect to bonus or severance payments to insiders does not apply to the relief requested herein.

such Employee releases any claims held against the Debtors. Severance is typically paid out to Employees in a lump-sum and generally no later than 52 days following the notice of termination.

42. As of the Petition Date, the Debtors estimate that they owe approximately $18,000 to twelve Employees on account of the Non-Insider Severance Program related to estimated healthcare reimbursements, presently due November 2020. The Debtors seek authority to pay any unpaid amounts due on account of the Non-Insider Severance Program consistent with past practice and to continue paying any amounts due on account of the Non-Insider Severance Program on a postpetition basis in the ordinary course of business.

**G. Discretionary Bonus Program.**

43. The Debtors maintain a discretionary annual incentive program to drive performance among their executives and Employees, which is based on performance targets that are set by management (the "Discretionary Bonus Program"). Historically, the Debtors' performance targets have been measured annually; however, the Debtors' performance targets, including lease operating expenses and certain environmental, social, and corporate governance metrics, for the period from August 2020 to July 2021 are, and will continue to be, measured each quarter. Employees who achieve the requirements qualify for a quarterly bonus, which, if approved by the Debtors' compensation committee, is typically paid in the month after the quarter end.

44. The Debtors believe the Discretionary Bonus Program is integral to the operation of the Debtors' business. In particular, the Discretionary Bonus Program aligns the Employees' interests with those of the Debtors generally by encouraging strong performance and overall efficiency of the Debtors' operations. For the avoidance of doubt, although the Discretionary Bonus Program includes insiders (*i.e.*, executives), by this Motion, the Debtors only seek authority to pay non-insider Employees.

45. Historically, the Debtors paid approximately $8,530,000 per year on account of the Discretionary Bonuses. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Discretionary Bonuses is approximately $750,000. The Debtors seek authority to pay their Employees any accrued, but unpaid prepetition Discretionary Bonuses consistent with past practice and to continue to pay the Discretionary Bonuses on a postpetition basis in the ordinary course of business.

## II. Employee Benefit Programs.

46. In the ordinary course of business, the Debtors incur certain expenses related to the Health Insurance Programs, Life and AD&D Insurance, Disability Benefits, Workers' Compensation Program, 401(k) Deductions, 401(k) Plan Contributions, COBRA Benefits Program, and Paid Leave (each as defined herein and, collectively, the "Employee Benefits Programs"). The Debtors historically paid approximately $870,000 per month on account of the Employee Benefits Programs. The Debtors seek authority to pay any accrued and outstanding prepetition amounts due pursuant to the Employee Benefits Programs consistent with past practice and to continue paying any amounts due pursuant to the Employee Benefits Programs on a postpetition basis in the ordinary course of business.

### A. Health and Welfare Programs.

47. The Debtors offer a comprehensive employee benefits package to all of their full-time Employees (working 30 or more hours per week) for medical, dental, and vision care coverage and certain other benefits (collectively, the "Health and Welfare Programs"), including:

- health care coverage;
- life insurance;
- disability benefits;

- workers' compensation; and
- the 401(k) Plan (as defined herein).

48. Historically, the Debtors paid approximately $850,000 per month on account of the Health and Welfare Programs. As of the Petition Date, the Debtors estimate that they owe approximately $2,760,000 on account of the Health and Welfare Programs. The Debtors seek authority to pay their Employees any amounts due pursuant to the Health and Welfare Programs consistent with past practice and to continue paying amounts due pursuant to the Health and Welfare Programs on a postpetition basis in the ordinary course of business.

**1. Health Insurance Programs.**

49. The Debtors offer their full-time Employees the opportunity to participate in a number of health benefit plans, including the Medical Plan, the FSAs, the Dental Plan, and the Vision Plan (each as defined below, and collectively, the "Health Insurance Programs").

50. ***The Medical Plan***. The Debtors offer medical and prescription drug benefit coverage to Employees and eligible dependents (the "Medical Plan"). The Medical Plan is administered by the Debtors. The Debtors use certain third party administers to process claims and manage other duties pursuant to the Medical Plan, including UMR, Inc. ("UMR") for medical claims and OptumRx, Inc. ("OptumRx") for pharmacy claims. Because the Medical Plan is self-insured, the Debtors are primarily responsible for Employee claims under the Medical Plan. The Debtors pay UMR and OptumRx a monthly administrative service fee for administration of payments and benefits under the Medical Plan. Generally, the medical and prescription drug coverage provided under the Medical Plan depends on a variety of factors, including whether the coverage is sought for an individual or a family, whether treatment is sought "in-network," meaning at a provider that contracts with United HealthCare Services, Inc., or whether the coverage provided is "out-of-network." Thus, monthly health care premiums vary depending on

the specific coverage under the Medical Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. Prescription coverage is provided to all Employees who enroll in the Medical Plan, although Employee out-of-pocket costs may vary depending on whether prescriptions are fulfilled through "in-network" or "out-of-network" providers. In connection with the Medical Plan, the Debtors contract with Teladoc Health, Inc. to provide participating Employees with 24/7 access to physicians via phone or video appointments with no consultation fees.

51. Historically, the Debtors paid approximately $380,000 per month on account of the Medical Plan. As of the Petition Date, the Debtors estimate that they owe approximately $730,000 on account of the Medical Plan. The Debtors seek authority to pay their Employees any amounts due pursuant to the Medical Plan consistent with past practice and to continue paying amounts due pursuant to the Medical Plan on a postpetition basis in the ordinary course of business.

52. ***The Flexible Spending Accounts***. The Debtors provide Employees the opportunity to access flexible spending accounts (the "FSAs"), administered by the Debtors, which set aside pre-tax dollars to cover incidental medical expenses allowed under sections 105 and 213(d) of the Internal Revenue Code ("IRC"), including dependent child care costs, not covered by the Medical Plan. Currently, approximately 83 Employees use the FSAs for medical costs or dependent child care, for which the Debtors pay a monthly administration fee of approximately $6,000. Employees may contribute a maximum annual total of $2,700 for incidental medical expenses and a maximum annual total of $5,000 for dependent child care costs. The Debtors do not make any contributions to any Employee's FSA.

53. ***Dental and Vision Insurance***. The Debtors also provide Employees with dental insurance (the "Dental Plan") administered by the Debtors. The Debtors use UMR to process

claims and manage other duties pursuant to the Dental Plan. The Dental Plan is self-insured, and the Debtors pay an administrative service fee of approximately $2,000 per month on account of the Dental Plan. The Debtors also provide Employees the opportunity to purchase vision insurance (the "Vision Plan"), administered by EyeMed Vision Care, LLC ("EyeMed"). The Vision Plan is self-insured, and the Debtors pay an administrative service fee of approximately $4,000 per month on account of the Vision Plan.

54. The Debtors pay approximately $370,000 per month in the aggregate on account of the Health Insurance Programs. As of the Petition Date, the Debtors estimate that approximately $750,000 is accrued and outstanding on account of the Health Insurance Programs. The Debtors seek authority to pay their Employees any amounts due pursuant to the Health Insurance Programs consistent with past practice and to continue paying amounts due pursuant to the Health Insurance Programs on a postpetition basis in the ordinary course of business.

55. ***Brokerage Fees.*** The Debtors obtain many of the Health Insurance Programs through their broker, The Plexus Groupe LLC (the "Broker"). The Broker assists the Debtors in obtaining Health Insurance Programs in the most cost effective manner, negotiates contract terms, provisions, and pricing, develops Health Insurance Programs that support the Debtors' overall business objectives, and provides ongoing support throughout enrollment. The Broker collects commission payments for services rendered from the various Health Insurance Program carriers as opposed to directly from the Debtors (the "Brokerage Fees"). Historically, the Debtors have paid approximately $3,500 per year on account of the Brokerage Fees relating to the Affordable Care Act administration services, plus approximately 3.1 percent of the medical and dental premiums and 10 percent of the Life and AD&D premiums, for which the Debtors have paid approximately $190,000 per year. As of the Petition Date, the Debtors estimate that approximately

$30,000 is accrued and outstanding on account of the Brokerage Fees. The Debtors seek authority to pay any amounts due pursuant to the Brokerage Fees consistent with past practice and to continue paying amounts due pursuant to the Brokerage Fees on a postpetition basis in the ordinary course of business.

### 2. Life and AD&D Insurance, Disability, and Workers' Compensation Programs.

#### a. Life and AD&D Insurance Programs.

56. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Standard Life and AD&D Insurance") to Employees through Standard Insurance Company ("Standard Insurance"), which provides maximum coverage of two times an Employee's annual earnings, rounded to the next higher multiple of $1,000, in an amount not to exceed $700,000. Employees may also purchase supplemental life insurance (the "Voluntary Life Insurance," and, together with the Standard Life and AD&D Insurance, the "Life and AD&D Insurance") through Standard Insurance, which provides maximum coverage of up to $500,000 for the applicable Employee. An Employee's combined benefit of Standard Life and AD&D Insurance and Voluntary Life Insurance may not exceed six times such Employee's annual earnings. Employees with Voluntary Life Insurance may also apply for coverage in other varying amounts for such Employee's spouse and children. The Debtors are fully insured through the Life and AD&D Insurance.

57. Historically, the Debtors have paid approximately $50,000 per month on account of the Life and AD&D Insurance. As of the Petition Date, the Debtors estimate that approximately $20,000 is accrued and outstanding on account of the Life and AD&D Insurance. The Debtors seek authority to pay their Employees any amounts due pursuant to the Life and AD&D Insurance

consistent with past practice and to continue paying amounts due pursuant to the Life and AD&D Insurance on a postpetition basis in the ordinary course of business.

**b. Disability Benefits.**

58. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits on the first day of the first month following their date of hire. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of 100 percent of their pre-disability weekly earnings up to a maximum of $2,500 per week in the event of a qualified non-work related illness or injury (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their pre-disability weekly earnings up to a maximum of $10,000 in the event of a qualified non-work related illness or injury (the "Long-Term Disability Benefits").

59. An Employee's Short-Term Disability Benefits begin (a) immediately after such Employee is injured or begins maternity leave or (b) fourteen calendar days after such Employee is absent from work due to illness. The Short-Term Disability Benefits continue for a maximum of 180 days of any disability thereafter. The Long-Term Disability Benefits begin after an Employee is absent from work for 180 days due to any disability and continue until normal Social Security retirement age; however, if an Employee becomes disabled at or after the age of 65, Long-Term Disability Benefits are payable pursuant to an age-based schedule. The Short-Term Disability Benefits and the Long-Term Disability Benefits are fully insured through Standard Insurance. The Debtors pay approximately $20,000 per month in premiums with respect to the Short-Term Disability Benefits and approximately $10,000 per month in premiums with respect to the Long-Term Disability Benefits.

60. Two Employees are currently receiving Disability Benefits. Historically, the Debtors paid approximately $30,000 per month on account of the Disability Benefits. As of the Petition Date, the Debtors estimate that approximately $10,000 is accrued and outstanding on account of the Disability Benefits and associated premiums. The Debtors seek authority to pay their Employees any amounts due pursuant to the Disability Benefits consistent with past practice and to continue paying amounts due pursuant to the Disability Benefits on a postpetition basis in the ordinary course of business.

**c. Workers' Compensation Program.**

61. The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate (the "Workers' Compensation Program"). All Employees are entitled to participate in the Workers' Compensation Program. Currently, the Debtors maintain coverage under the Workers' Compensation Program through Starr Specialty Insurance Co. ("Starr") and the Ohio Bureau of Workers' Compensation.

62. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[5] There are currently three open claims under the Workers' Compensation Program. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy

[5] The Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

Code to permit the Employees to proceed with such claims. This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

63. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. The annual cost of the Workers' Compensation Program through Starr is approximately $210,000 and the annual cost of the Workers' Compensation Program through the Ohio Bureau of Workers' Compensation is approximately $60,000. As of the Petition Date, the Debtors do not owe any amounts on the Workers' Compensation Program. The Debtors request authority to (a) pay prepetition amounts due on account of the Workers' Compensation Program and consistent with past practice, (b) continue the Workers' Compensation Program in the ordinary course of business, and (c) to the extent applicable, modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

64. The Workers' Compensation Program is subject to regular audits (the "Workers' Compensation Audits"), which may result in an adjustment of the premiums owed. Workers' Compensation Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Workers' Compensation Audits is not known at this time. Accordingly, the Debtors seek authority to honor any amounts owed on account of any Workers' Compensation Audits in the ordinary course of business.

**d. 401(k) Plan.**

65. The Debtors provide all Employees with the ability to participate in a 401(k) defined contribution program (the "401(k) Plan"). Employees generally are eligible to participate in the 401(k) Plan on the first day of the month following the Employee's date of hire,

unless otherwise noted. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code as well as for certain post-tax deductions. Each Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). As of the Petition Date, the Debtors estimate that they are obligated to remit approximately $180,000 on account of the 401(k) Deductions.

66. The Debtors match the Employees' 401(k) Plan contributions on a discretionary, dollar-for-dollar basis in an amount up to 100 percent of the Employees' first four percent of eligible compensation and 50 percent of the Employees' next two percent of eligible compensation (collectively, the "401(k) Contributions"). The Debtors contribute approximately $180,000 per month on account of the 401(k) Contributions. As of the Petition Date, approximately $100,000 in 401(k) Contributions are accrued and outstanding.

67. The 401(k) Plan currently is administered by the Debtors. All administrative costs associated with the 401(k) Plan are deducted from the assets contributed by the Employees.

68. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions. As such, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions generally are held in trust by the Debtors and are not property of their estates. The Debtors request authority to continue the 401(k) Plan consistent with past practice and to continue paying amounts due pursuant to the 401(k) Plan on a postpetition basis in the ordinary course of business, including (a) remitting the 401(k) Contributions, and (b) transferring the 401(k) Deductions.

**e. COBRA Benefits.**

69. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees (the "COBRA Participants") may continue insurance coverage under the Medical Plan, Dental Plan, and Vision Plan, and may continue participation in the FSAs following the termination of their employment with the Debtors (the "COBRA Benefits"). More specifically, COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to eighteen months, and in some instances up to 36 months, following termination of employment. Approximately eleven former Employees receive COBRA Benefits. COBRA Participants are responsible for paying all premium costs associated with the COBRA Benefits. The Debtors administer the COBRA Benefits and collect premiums costs related thereto for the FSAs, UMR administers the COBRA Benefits and collects premiums costs related thereto for the Medical Plan and Dental Plan, and EyeMed administers the COBRA Benefits and collects premiums costs related thereto for the Vision Plan. The Debtors, UMR, and EyeMed then remit these funds to the applicable healthcare services provider.

70. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of the COBRA Benefits. Out of an abundance of caution, the Debtors request authorization to (a) remit all outstanding prepetition amounts incurred on account of the COBRA Benefits, (b) continue to offer the COBRA Benefits, including to those Employees who may be terminated after the Petition Date, and honor all obligations related thereto on a postpetition basis consistent with their prepetition practices, and (c) continue to pay fees related to the COBRA Benefits on a postpetition basis in the ordinary course of business.

**B. Paid Leave.**

71. The Debtors maintain certain paid leave benefit programs for Employees, providing paid leave for PTO, Holidays, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

72. In the ordinary course of business, the Debtors provide paid time off ("PTO") to the Employees as a Paid Leave benefit. Regular, full-time Employees working a minimum of 30 hours per week are eligible to accrue PTO. PTO accrues bi-weekly in pro-rated increments at a specified rate based on an Employee's length of service. An Employee accrues between 4.615 and 10.769 hours of PTO each pay period. Employees may carry over up to 120 hours of their accrued but unused PTO into the next calendar year at the end of any calendar year. Employees who are terminated or resign are entitled to a cash payment in lieu of their accrued but unused PTO, subject to deduction for any amounts owed to the Debtors. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid PTO is approximately $1,670,000. This amount is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO in the event an Employee leaves the Debtors' employment.

73. In addition, the Debtors also offer Employees eight paid holidays throughout the year (each a "Holiday"). Employees on a leave of absence (whether paid or unpaid) do not receive Holiday pay unless a specific policy provides otherwise. Generally, eligible Employees are not required to work on a designated Holiday, but to the extent they do, Employees are paid for Holiday time plus their base rate of pay.

74. The Debtors also permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Employees for certain missed work time in the ordinary course of business for bereavement, jury

duty, short-term disability, voting, and all legally required leaves (collectively, the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

75. The Debtors believe that the continuation of the Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. As a result, the Debtors seek authority to allow eligible Employees to use their Paid Leave in the ordinary course of business and consistent with historical practice on a postpetition basis and to pay any PTO accrued in the ordinary course of business. To be clear, the Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

## III. Supplemental Employee Benefits.

76. The Debtors incur certain expenses related to the Stock Incentive Program and Other Additional Benefits Programs (each as defined herein and, collectively, the "Supplemental Employee Benefits"). The Debtors historically paid approximately $21,000 per month on account of the Supplemental Employee Benefits. The Debtors seek authority to pay their Employees any amounts due pursuant to the Supplemental Employee Benefits consistent with past practice and to continue paying amounts due pursuant to the Supplemental Employee Benefits on a postpetition basis in the ordinary course of business.

### A. Stock Incentive Program.

77. The Debtors provide their Employees the opportunity to participate in a stock incentive program, by which the Debtors award Employees unvested shares of common stock, which, once vested, are eligible for sale by such Employees (the "Stock Incentive Program"). The Debtors contract with Global Shares Public Limited Company ("Global Shares") for services

relating to the vesting of such common stock and with UBS Group AG/UBS Group SA/UBS Group Inc. ("UBS") for services relating to the settlement and sale of such common stock.

78. The annual cost of the Stock Incentive Program through Global Shares is approximately $36,000 and the annual cost of the Stock Incentive Program through UBS is approximately $5,000. The Debtors do not believe that they owe, or will owe, any amounts on account of the Stock Incentive Program or any common stock that may vest during these chapter 11 cases. For the avoidance of doubt, the Debtors seek authority to pay any amounts due and outstanding as of the Petition Date on account of the Stock Incentive Program in the ordinary course of business.

**B. Other Additional Benefits Programs.**

79. The Debtors also provide their Employees the opportunity to participate in supplemental benefits funded by the Debtors, including the Kempton Preferred Provider Program, Pet Insurance, LifeLock, the Employee Assistance Plan, and Concierge Service (each as defined below and, collectively, the "Other Additional Benefits Programs"):

- **Kempton Preferred Provider Program.** The Kempton Preferred Provider Program offers select, self-funded plans wherein Employees may opt to receive a procedure via a Preferred Provider with 100 percent of the costs covered, therefore saving available funds pursuant to other medical coverage. The Kempton Preferred Provider Program has no deductible.

- **Pet Insurance.** The Debtors have contracted with Nationwide to provide Employees with various levels of reimbursement for pet-related expenses without networks and with optional wellness coverage available at the expense of such participating Employees.

- **LifeLock.** Employees are eligible to participate in LifeLock for identity theft protection at the expense of such participating Employees.

- **Employee Assistance Plan.** Employees are eligible to participate in an employee assistance program funded by the Debtors (the "Employee Assistance Program") offering confidential access to counseling, programs, and services needed to balance work and home life. Each participating Employee is entitled to six

in-person counseling sessions in connection with the Employee Assistance Program.

- **Concierge Service.** Employees have access to certain convenience services at no cost to Employees.

80. Historically, the Debtors have paid approximately $21,000 per month on account of the Other Additional Benefits Programs. As of the Petition Date, the Debtors estimate that approximately $10,000 is accrued and outstanding on account of the Other Additional Benefits Programs. The Debtors seek authority to pay their Employees any amounts due pursuant to the Other Additional Benefits Programs consistent with past practice and to continue paying amounts due pursuant to the Other Additional Benefits Programs on a postpetition basis in the ordinary course of business.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

81. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. The payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an

ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.”).

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

82. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees’ paychecks. Certain Withholding Obligations are not property of the Debtors’ estates because the Debtors have withheld such amounts from the Employees’ paychecks on another party’s behalf. *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc’ns*, 258 B.R. at 370 (Bankr. S.D. Tex. 2000) (noting that, for tax obligations where funds are held by the debtor in trust, “the legal right to payment of such claims at any time appears irrefutable.”) (citing *Matter of Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

83. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees’ paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees’ wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors’ estates, the Debtors request that the Court

authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

84. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

### C. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.

85. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). These courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

86. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor

to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497). Under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

87. Payment of Employee Compensation and Benefits is warranted under the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. If the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits, the Employees will be

exposed to significant financial difficulties. Continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

88. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, the workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such individuals may then elect to seek alternative employment opportunities. A significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts which may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors believe that payment of the prepetition obligations related to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value. The ability to make such payments will give the Debtors the greatest likelihood of retaining their Employees as the Debtors seek to operate their business in these chapter 11 cases.

## II. A Limited Waiver of the Automatic Stay for the Workers' Compensation Program Is Appropriate in this Case.

89. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

90. The Debtors seek authorization under section 362(d) of the Bankruptcy Code to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

91. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor-in-possession financing. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to an authorized payment in respect of the relief requested herein. Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. The Debtors request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## Emergency Consideration

92. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested could hinder their operations and cause irreparable harm. The failure to receive the requested relief during the first 25 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

93. To implement the foregoing successfully, the Debtors request that the Court enter an Order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

94. Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to

section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

95. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier, or hand delivery, to parties in interest, including: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group; (d) counsel to the DIP Agent; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (i) the state attorneys general for states in which the Debtors conduct business; (j) the indenture trustee under the Unsecured Notes; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested in this Motion and grant such other and further relief as is appropriate under the circumstances.

Houston, Texas
November 15, 2020

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Veronica A. Polnick (TX Bar No. 24079148)
Cameron A. Secord (TX Bar No. 24093659)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
vpolnick@jw.com
csecord@jw.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4600
Facsimile: (212) 446-4800
Email: edward.sassower@kirkland.com
steven.serajeddini@kirkland.com

-and-

Christopher S. Koenig (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chris.koenig@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on November 15, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh